**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHARLES J. HARRISON,** | : | **Civil No. 1:16-CV-1169** |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **NANCY A. BERRYHILL**[1] | : | |
| **Acting Commissioner of** | : | |
| **Social Security** | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

The plaintiff, Charles Harrison, ("Mr. Harrison") is an adult individual who resides within the Middle District of Pennsylvania.   On November 28, 2012, Harrison filed a claim for disability insurance benefits, alleging his disability began on September 21, 2011.   This claim was denied in a final decision of the Acting Commissioner of the Social Security Administration ("Commissioner").   He now appeals.

This matter has been assigned to the undersigned United States Magistrate Judge on consent of the parties, pursuant to the provisions of 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (Doc. 13; Doc. 14).  Upon a

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Acting Commissioner Nancy A. Berryhill is automatically substituted as the named defendant in place of the former Commissioner of Social Security.

careful review of the administrative record, and following consideration of the arguments of counsel, for the reasons expressed herein, we have found that the final decision of the Commissioner is supported by substantial evidence. Accordingly, we will affirm the Commissioner's decision.

## II.    <u>Background and Procedural History</u>

The record of Mr. Harrison' medical treatment for physical and mental health issues is extensive.  On August 16, 2011, a few weeks prior to his alleged September 21, 2011, date of onset of disability, Mr. Harrison underwent back surgery to relieve pressure on his nerve root at L5.  About a week after the surgery, Nicholas Pandelidis, M.D., the orthopedist who performed the procedure, noted that Mr. Harrison's leg pain was "much better," but he would need physical therapy.  (Admin. Tr. 569-70; Doc. 12-15 pp. 4-5).  Shortly after his alleged date of onset of disability, Mr. Harrison conducted a work-conditioning physical therapy program at the Drayer Physical Therapy Institute.  (Admin. Tr. 498, 516; Doc. 12-12 pp. 48, 66).

On October 12, 2011, Dr. Pandelidis found Mr. Harrison's sciatica was resolving.  (Admin. Tr. 471; Doc. 12-12 p. 21).  He indicated that Mr. Harrison "could do light work, but no frequent bending, twisting, or lifting and no lifting greater than 20 pounds.  Ultimately he should be able to get back to moderately

heavy work. He should not go back to jack hammering." (Admin. Tr. 571; Doc. 12-15 p. 6). This assessment was upgraded at the next scheduled appointment on November 23, 2011. Based on the evaluation of physical therapists at Drayer, Dr. Pandelidis released Mr. Harrison to "medium duty" work. (Admin. Tr. 572, 593-96; Doc. 12-15 pp. 7, 28-31). Finally, at the next appointment, on December 27, 2011, Dr. Pandelidis released Mr. Harrison back to work without restrictions but also stated he should avoid the heaviest work. (Admin. Tr. 573; Doc. 12-15 p. 8). Dr. Pandelidis reported that although Mr. Harrison's neck mobility was "somewhat decreased," his gait was "good" and he had some tenderness but not spasm. Id.

Dr. Pandelidis referred Mr. Harrison to Ali Yousufuddin, M.D. On March 23, 2012, Dr. Yousufuddin examined Mr. Harrison for his complaint of chronic low back pain that had continued after surgery. (Admin. Tr. 579; Doc. 12-15 p. 14). Dr. Yousufuddin reported that Mr. Harrison's straight leg-raising was normal bilaterally at 90 degrees. (Admin. Tr. 580; Doc 12-15 p. 15). Mr. Harrison's motor strength in his legs was 5/5. Id. He had tenderness over the left sacroiliac joint, but no numbness in his legs or feet. Id. Dr. Yousuffuddin recommended injections at the left lumbar facet and sacroiliac joint. (Admin. Tr. 581; Doc. 12-15 p. 16). Mr. Harrison stated he had fifty percent less pain from his left-sided lower back one month after the injections. (Admin. Tr. 582; Doc. 12-15 p. 17). Dr.

Yousufuddin noted Mr. Harrison had "marked tenderness present over the left sacroiliac joint" but that his range of motion was "adequate in all directions" and his straight leg-raising test was again negative. (Admin. Tr. 583; Doc. 12-15 p. 18).

Mr. Harrison presented at Holy Spirit Hospital with a right arm infection on November 19, 2012. (Admin. Tr. 717; Doc. 12-17 p. 49). Helen Makinde, M.D. reported that Mr. Harrison's gait and musculoskeletal examination was normal. (Admin. Tr. 718; Doc. 12-17 p. 50). His memory was intact, his speech was normal, his affect was appropriate, and his thought content was normal. Id. Mr. Harrison denied any hallucinations and suicidal/homicidal ideation. Id.

At the request of the state agency, Thomas McLaughlin, M.D. examined Mr. Harrison on February 7, 2013. (Admin. Tr. 780; Doc. 12-18 p. 31). Dr. McLaughlin took note of the fact of Mr. Harrison's 2011 back surgery and also noted that Mr. Harrison continued to complain of back pain. Id. Mr. Harrison also complained to Dr. McLaughlin of knee issues dated back to a high school football injury in 1983 and ACL replacement in both knees. (Admin. Tr. 781; Doc. 12-18 p. 32).

Dr. McLaughlin opined Mr. Harrison could frequently lift two to three pounds and occasionally ten pounds, and could walk one to two hours a day and sit

for eight hours a day with a sit/stand option. (Admin. Tr. 787; Doc. 12-18 p. 38). Dr. McLaughlin further opined that Mr. Harrison could occasionally bend, but never kneel, stoop, crouch, balance, or climb. (Admin. Tr. 788; Doc. 12-18 p. 39). X-rays of Mr. Harrison's knees showed "minor osteoarthritic changes involving the medial and, to a lesser extent, the lateral joint compartments." (Admin. Tr. 791; Doc. 12-18 p. 42). The x-rays did not show osseous injury or loose body though, and there was no visible joint fluid. Id.

On April 25, 2013, Mr. Harrison was treated at Holy Spirit Hospital for back pain he experienced after falling off his back porch step a few weeks prior. (Admin. Tr. 872; Doc. 12-19 p. 37). Tamra Helmert, M.D. compared an x-ray of Mr. Harrison's back with old x-ray images of Mr. Harrison from May 23, 2011. (Admin. Tr. 875; Doc. 12-19 p. 40). Dr. Helmert found anatomic alignment of the lumbar spine, with vertebral body heights maintained, intervertebral disc space narrowing at L4/5 and L5/S1, no compression fracture, and normal sacroiliac joints. Id. Dr. Helmert stated that Mr. Harrison showed "[m]ild degenerative changes with disc space narrowing with facet arthropathy at the level L4/L5 and L5/S1," and did not show "acute compression fracture[s] or malalignment." Id.

At the request of the state agency, Stanley Schneider, Ed.D. performed a clinical psychological evaluation of Mr. Harrison on May 14, 2013. (Admin. Tr.

797; Doc. 12-18 p. 48). Mr. Harrison reported to Dr. Schneider that he was not receiving any outpatient mental health treatment. (Admin. Tr. 800; Doc. 12-18 p. 51). He also reported that he had been on Zoloft "and had a positive response to the medication." Id. Dr. Schneider stated that Mr. Harrison was able to perform serial fives, "slowly, but accurately." (Admin. Tr. 803; Doc. 12-18 p. 54). He further stated that Mr. Harrison "was oriented to date and place" although "[h]e incorrectly name [sic] the day of the week." Id. Mr. Harrison exhibited no significant memory impairment. Dr. Schneider did note that Mr. Harrison's attention and concentration were impaired, though only mildly. Id. Mr. Harrison told Dr. Schneider that he is able to do light cleaning, cook, and pay bills. (Admin. Tr. 804; Doc. 12-18 p. 55). He also told Dr. Schneider that he has a few friends and goes to church a couple of times a week. Id.

Dr. Schneider opined that Mr. Harrison had a "mild" restriction on the ability to understand and remember simple instructions. (Admin. Tr. 806; Doc. 12-18 p. 58). He found Mr. Harrison had a "marked" restriction on the ability to carry out complex or simple instructions, the ability to understand and remember complex instructions, and the ability to make judgments on complex work-related decisions. Id. In support of his assessment, Dr. Schneider cited "Chronic pain – low tolerance for sitting. Poor focus." Id. In the area of interaction with others,

Dr. Schneider found Mr. Harrison had "marked" restriction on the ability to interact appropriately with the public, the ability to interact appropriately with co-workers, and the ability to respond appropriately to usual work situations and changes in a routine work setting. (Admin. Tr. 807; Doc. 12-18 p. 59). He found Mr. Harrison had a "moderate" restriction on the ability to interact appropriately with supervisors. Id. In support of those findings, Dr. Schneider cited the fact that Mr. Harrison reported a loss of temper at work and stated to Dr. Schneider, "I've been fighting my whole life." Id.

On May 22, 2013, John Gavazzi, Psy.D. reviewed Mr. Harrison's record, including Dr. Schneider's assessment, on behalf of the agency. (Admin. Tr. 135-37; Doc. 12-4 pp. 12-14). Dr. Gavazzi opined that Mr. Harrison "can understand, retain, and follow simple job instructions, i.e., perform one- [sic] and two-step tasks" and that Mr. Harrison "can perform simple, routine, repetitive work in a stable environment." (Admin. Tr. 136; Doc. 12-4 p. 13). Dr. Gavazzi reported that Mr. Harrison was moderately limited in his ability to do the five following tasks: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) interact appropriately with the general public; (4) accept instructions and respond appropriately to criticism from supervisors; and, (5)

respond appropriately to changes in the work setting. (Admin. Tr. 136-37; Doc. 12-4 pp. 13-14).

Milagros Buenaventura, M.D., of Diakon Family Life Services performed a psychiatric evaluation on Mr. Harrison on August 13, 2013. (Admin. Tr. 881; Doc. 12-20 p. 2). Dr. Buenaventura reported that Mr. Harrison was cooperative with good eye contact and that his speech was normal in rate and tone. (Admin. Tr. 882; Doc. 12-20 p. 3). Mr. Harrison appeared appropriately groomed and also appeared his stated age. Id. Mr. Harrison reported to Dr. Buenaventura that he had suicidal ideations at times but he did not think he would harm himself. (Admin. Tr. 882-83; Doc. 12-20 p. 3-4). He said he used to have thoughts about having fights with people but he no longer had those thoughts. (Admin. Tr. 883; Doc. 12-20 p. 4). He had no hallucinations or delusions, though he did think people were out to get him. Id. Mr. Harrison's thinking was goal-directed and he was oriented in three spheres. Id. Dr. Buenaventura found Mr. Harrison's memory to be fair and his intellectual functioning to be average. Id. However, he found Mr. Harrison's judgment to be poor and opined that Mr. Harrison lacked insight. Id. Dr. Buenaventura recommended Mr. Harrison receive counseling from Rosemarie Holland, MA, LPC at Diakon Family Life Services. Id.

On August 24, 2014, George Wiswesser, M.D. authored a progress note that reported Mr. Harrison had normal energy, was generally cooperative, and had an unremarkable appearance and psychomotor. (Admin. Tr. 920; Doc. 12-21 p. 5). Mr. Harrison's speech rate was normal, his mood was euthymic, and his affect was congruent. Id. His thought process was linear and goal directed. Id. Mr. Harrison was not suffering from any hallucinations or delusions, nor did he have suicidal/homicidal ideations. Id. His cognition was grossly intact. Id.

On September 17, 2013 Dr. Buenaventura authored a psychiatric progress note. (Admin. Tr. 891; Doc. 12-20 p. 12). Dr. Buenaventura reported that Mr. Harrison's appetite had increased while his energy had decreased. Id. Mr. Harrison's sleep was "not good" and complicated by anxiety. Id. Mr. Harrison's mood was depressed. Id. However, he was generally cooperative and his appearance and psychomotor were unremarkable. Id. His speech rate was normal and his affect was congruent. Id. Dr. Buenaventura observed that Mr. Harrison's thought process was linear and goal directed. Id. He did not suffer from hallucinations or delusions. Id. Mr. Harrison had not suicidal/homicidal ideations and his cognition was grossly intact. Id.

The next psychiatric progress report, dated October 11, 2013, this time by Dr. Wiswesser again, showed much improvement in Mr. Harrison's condition.

(Admin. Tr. 890; Doc. 12-20 p. 11). Specifically, his sleep, energy, and libido were now normal, and his mood was upgraded from depressed to euthymic. <u>Id</u>. The rest of the evaluation categories, which had not shown any issues before, continued to present no issue. Mr. Harrison was still generally cooperative and his appearance and psychomotor were still unremarkable. <u>Id</u>. His speech rate was still normal, and his affect was still congruent. <u>Id</u>. Mr. Harrison still had a linear and goal directed thought process and still did not suffer hallucinations or delusions. <u>Id</u>. He still had no suicidal/homicidal ideations and his cognition was still grossly intact. <u>Id</u>.

Mr. Harrison continued to present no issue through the conclusion of his treatment with Dr. Wiswesser sometime after August 26, 2014, a span of eight more psychiatric progress reports. (Admin. Tr. 885-89, 920-26; Doc. 12-20 pp. 6-10, 4-10). Mr. Harrison had normal appetite, energy, sleep, and libido. <u>Id</u>. Mr. Harrison was generally cooperative and his appearance and psychomotor were unremarkable. <u>Id</u>. His speech rate was normal, his mood was euthymic, and his affect was congruent. <u>Id</u>. Mr. Harrison had a linear and goal directed thought process and did not suffer hallucinations or delusions. <u>Id</u>. He had no suicidal/homicidal ideations and his cognition was grossly intact. <u>Id</u>. However, the nine reports of repeatedly normal findings were contradicted in nearly every

category by Rosemarie Holland, MA, LPC in a single report, which was dated February 12, 2014. (Admin. Tr. 911-16; Doc. 12-20 pp. 32-37).

At the time of the hearing, Mr. Harrison was divorced with one teenage child. (Admin. Tr. 801; Doc. 12-18 p. 52). He was born in 1964 and is a high school graduate. (Admin. Tr. 288; Doc. 12-7 p. 18). Mr. Harrison has past relevant work as a roll tender and maintenance worker. (Admin. Tr. 50; Doc. 12-2 p. 51).

Mr. Harrison filed an application for disability insurance benefits under Title II of the Social Security Act on November 28, 2012. After his claim was denied at the initial level of administrative review, a hearing was held on October 28, 2014 before an Administrative Law Judge ("ALJ"). That hearing was continued until January 15, 2015, when the ALJ obtained testimony from a VE who was present at the first hearing. (Admin. Tr. 49; Doc. 12-2 p. 50). The ALJ issued an opinion denying Mr. Harrison's claim on January 26, 2015. (Admin. Tr. 37; Doc. 12-2 p. 38).

In this opinion at Step One of the five-step sequential analysis process that applies to Social Security disability claims, the ALJ found Mr. Harrison was not working at a substantial gainful activity. (Admin. Tr. 25; Doc. 12-2 p. 26). At Step Two, the ALJ found Mr. Harrison had the following eight severe

impairments: (1) degenerative disc disease of the lumbar spine; (2) degenerative joint disease of the knees; (3) major depressive disorder; (4) bipolar disorder; (5) anxiety disorder; (6) substance abuse disorder; (7) ADHD; and, (8) personality disorder. Id. At Steps Three and Four, the ALJ found that Mr. Harrison's severe impairments did not meet or equal a Listing that would cause him to be *per se* disabled, (Admin. Tr. 26-29; Doc. 12-2 pp. 27-30), but that his impairments nonetheless prevented him from performing his past relevant work. (Admin. Tr. 35; Doc. 12-2 p. 36).

The ALJ then determined that Mr. Harrison had the following residual functional capacity:

> [T]o perform less than the full range of light work as defined in 20 CFR 404.1567(b). He can frequently lift thirty pounds and frequently carry twenty pounds. He can occasionally lift or carry forty pounds. He is limited to sitting for three hours, standing for three hours, and walking for three hours. He can push/pull with the upper extremities a maximum of fifty pounds. He can frequently reach in all directions. He can occasionally crouch, stoop, and climb ramps and stairs. He is limited to occasional exposure to cold temperature extremes. He is limited to jobs that can be learned within one month with repetitive short cycle tasks, occasional decision making, and occasional interaction with coworkers, supervisors, and the public.

(Admin. Tr. 29; Doc. 12-2 p. 30). Finally, at Step Five, the ALJ determined that there were jobs in the national economy that Mr. Harrison could perform and thus

he was not disabled as defined by the Social Security Act. (Admin. Tr. 36; Doc. 5-2 p. 37).

The agency Appeals Council denied Mr. Harrison's request for review of the ALJ's decision. The denial by the Appeals Council made the ALJ's January 26, 2015, decision the final decision of the Acting Commissioner—subject to review by this Court.

On June 16, 2016, Mr. Harrison filed a complaint in this Court alleging that the Commissioner's final decision denying his claim is contrary to the law and regulations, and that the Commissioner's findings of fact are not supported by substantial evidence. (Doc. 1). As relief, Mr. Harrison requests that the Acting Commissioner's decision be reversed and set aside, or in the alternative, that this case be remanded for a new administrative hearing. Id.

On August 23, 2016, the Commissioner filed her answer. (Doc. 11). The Commissioner maintains that the final decision denying Mr. Harrison' claim was made in accordance with the law and regulations, and is supported by substantial evidence. Together with her answer, the Commissioner filed a certified transcript of the administrative proceedings in this case. (Doc. 12).

This matter has been fully briefed by the parties and is ripe for decision. (Doc. 13; Doc. 16).

## III.  Legal Standards

### A. Substantial Evidence Review – the Role of This Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).  "In determining if

the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before this Court, therefore, is not whether Mr. Harrison is disabled, but whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. <u>See Arnold v. Colvin</u>, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); <u>Burton v. Schweiker</u>, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

## B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A);

see also 20 C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a).  To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.  42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.  20 C.F.R. §404.1520(a).  Under this process, the ALJ must sequentially determine:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps Three and Four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the

limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

At Steps One through Four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. 42 U.S.C. §423(d)(5); 20 C.F.R. §404.1512[2]; Mason, 994 F.2d at 1064.

Once this burden has been met by the claimant, it shifts to the Commissioner at Step Five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

---

[2] The version of 20 C.F.R. § 404.1512 effective on the date the ALJ issued his decision in his case has been amended during the pendency of this action. Section (a) of this regulation was not substantively changed, and section (f) was redesignated as section (b)(3) in the new version of 20 C.F.R. § 404.1512. We cite to the version of this regulation that was effective on the date of the ALJ's decision, see 20 C.F.R. § 404.1512(effective Apr. 20, 2015 to Mar. 26, 2017), however, the outcome in this case would be the same under the new version of this regulation.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

**IV.   Discussion**

On appeal Harrison raises two interrelated issues before this Court:

(1) Did the ALJ erroneously weigh the medical opinions of record?

(2) Is the ALJ's "mental RFC" assessment facially deficient?

These two issues are interrelated because Harrison's RFC argument is based upon what he alleges was the erroneous weighing of the medical evidence. Yet, under the deferential standard of review that applies to Social Security appeals, we

find for the Acting Commissioner on Mr. Harrison's first issue. Because Mr. Harrison's second issue relies on the logic of his first issue, his second issue also fails.

### A. The ALJ weighed the medical opinions in accordance with 20 C.F.R. § 404.1527(c) and Properly Determined Harrison's Residual Functional Capacity Based Upon this Medical Evidence

The version of the Commissioner's regulations governing how an ALJ must evaluate medical opinions in effect on the date the ALJ issued her decision provide, in pertinent part:

> (c) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization.   We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors.  When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

20 C.F.R. § 404.1527(c) (effective August 24, 2012 through March 26, 2017).

"[T]he ALJ has no obligation to explicitly enumerate each of the six factors described in the Social Security regulations."  Grant v. Astrue, 857 F. Supp. 2d

146, 155 (D.D.C. 2012). "The regulations require only that 'good reasons' be provided for the weight given a treating physician's opinion." Id. (internal citations omitted). The regulations further provide that the Commissioner is required to evaluate all evidence in the case record that has a bearing on the determination of disability. See 20 C.F.R. §§ 404.1520(a)(3), 404.1520b (effective Mar. 26, 2012 through Mar. 26, 2017).

Mr. Harrison argues that the ALJ erroneously accorded limited weight to the medical opinions of the agency's examining physician, Dr. McLaughlin; the agency's examining psychologist, Dr. Schneider; the agency's non-examining psychiatrist, John Gavazzi, Psy.D.; and, Mr. Harrison's treating psychiatrist, Ms. Holland. (Plaint. Br. 3-7; Doc. 13 pp. 3-7). He further contends the alleged error harms him because those sources documented limitations greater than the RFC that the VE used to determine there are jobs in the national economy that he can perform. (Plaint. Br. 7; Doc. 13 p. 7).

The ALJ afforded the opinion of Dr. McLaughlin limited weight because she found it was "not consistent with the plethora of normal clinical examination findings. (Admin. Tr. 34; Doc. 12-2 p. 35). She also afforded the opinion of Dr. Schneider limited weight because she found it was "not consistent with the repeated normal mental status examination findings noted in the claimant's

medical records." Id. As for Mr. Gavazzi, the ALJ afforded his opinion, which

found no more than moderate issues, generally significant weight. Id. However,

the ALJ gave "limited weight to that aspect of the opinion indicating that the

claimant has experienced episodes of decompensation of extended duration

because it is not consistent with the entirety of the record." Id. Finally, the ALJ

afforded the opinion of Ms. Holland limited weight because it was "not consistent

with the entirety of the claimant's medical records, including the persistently

documented normal mental status examination findings." Id.

Mr. Harrison denies that the record contains persistent normal findings,

physical or mental, in the record. He further contends that even if there were

records of such findings, the ALJ failed to cite them. However, there are persistent

normal findings, both physical and mental, in the record; and, the ALJ did cite

them.

The ALJ explained her assessment of Mr. Harrison's physical capacity as

follows:

> **The undersigned notes that the claimant's medical records also document that the claimant was assessed with a negative bilateral straight leg raising test, normal strength in his lower extremities, no tenderness, redness, warmth, swelling, effusion, laxity, crepitus, or clicks of the knees, and a gait within normal limits (Exhibits 4F, 7F, 8F).** He was observed to able to ascend and descend stairs using an alternative pattern and without the use of handrails (Exhibit 4F). He was also observed to be able to walk

on the heels, walk on the toes, walk heel to toe, squat without difficulty, stand unassisted and be able to rise from the seated position, step up and down from an examination table without difficulty or assistive devices, stand on one leg at one time and appeared comfortable both in the seated and supine position (Exhibit 5F). Additionally, the claimant's medical records indicate that he was able to complete all physical therapy exercises during a physical therapy treatment session despite a reported pain level of 8/10 at the time and was able to perform the whole physical therapy "program" very fast (Exhibit 3F). **Such clinical examination findings and observations are not consistent with the claimant experiencing symptomatology and limitations associated with his back and knee impairments to the extent he has suggested and undermines his credibility regarding his allegations pertaining to same**.

The undersigned acknowledges that the claimant's treatment measures have included physical therapy treatment, injections for pain, the use of prescribed pain medication, the use of a TENS unit, lumbar spine surgery, and a remote history of reconstructive surgery on both knees (Exhibits 1F, 3F, 4F, 5F, 13F, 14F, 20F). **However, the entirety of the claimant's medical records indicates that the claimant has not sought treatment for his purported symptomatology associated with his back and knee impairments on a persistent basis throughout the relevant period of time for this matter and include a notable gap between May, 2012 and May, 2013 (Exhibits 4E 14F). The lack of persistent treatment for his . . . symptomatology and limitations associated with his lumbar spine and knee impairments during the relevant period of time for this matter is not consistent with the claimant's allegations regarding his symptomatology and limitations and undermines his credibility regarding his allegations pertaining to same.** Additionally, although the claimant has alleged that he uses a prescribed cane at times (Testimony of Charles Jeffrey Harrison) the claimant's medical records do not indicate that the cane was prescribed by a health care provider.

(Admin. Tr. 31-32; Doc. 12-2 pp. 33-34) (emphasis added).  This analysis cites to the normal findings of Dr. Pandelidis, Dr. Makinde, Dr. McLaughlin himself, and records from Mr. Harrison's physical therapy program.

The ALJ then explained her assessment of Mr. Harrison's mental health as follows:

> **The undersigned notes, however, that the claimant's mental health therapy treatment records also indicate repeated normal mental status examination findings characterized by a normal appetite, normal energy level, normal sleep, normal libido, unremarkable appearance, unremarkable psychomotor, normal speech, euthymic mood, congruent affect, linear and goal directed thought process, normal thought content, no suicidal ideation, no homicidal ideation, and grossly intact cognition (Exhibits 15F, 18F).**  He was also noted to have an affect appropriate to the situation and be able to engage in appropriate conversation, no significant memory impairment, and answer questions appropriately and follow directions (Exhibits SF, 1OF).  The presence of such repeated normal mental status examination findings is not consistent with the claimant experiencing symptoms and limitations to the ex1ent he has suggested and undermines his credibility regarding his allegations pertaining to same.

(Admin. Tr. 32; Doc. 12-2 p. 33) (emphasis added).  This analysis cites to the records of Diakon Family Life Services, specifically the numerous and continuous normal mental health findings by Dr. Buenaventura and Dr. Wiswesser.

The ALJ's review of the evidence discloses that the plaintiff's physical and mental limitations found in the record were not unanimously agreed upon, as Mr. Harrison claims.  Quite the contrary, the administrative record is marked by

competing and contrasting evidence. Accordingly, the ALJ did follow the regulations on weighing of medical opinions. She looked to the consistency of the opinions with the record as a whole, which is one of the enumerated techniques found at 20 C.F.R. § 404.1527(c). Furthermore, it is clear from the ALJ's decision that this medical evidence received individualized consideration. Thus, in its decision ALJ accepted some of this opinion evidence, assigned limited weight to other aspects of the consulting physician opinion when that opinion was undermined by objective evidence, and fashioned a residual functional capacity for Harrison based upon the record as a whole. All of these assessments reflected a careful and measured approach to this issue, and in each instance we conclude that substantial, albeit disputed, evidence supported these findings by the ALJ. Therefore, the ALJ's decision to weigh these opinions as she did is supported by substantial evidence.

This is all that the law requires in this setting, where we are called upon to review an administrative law judge's determination of a disability claim. Mindful of the fact that substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Pierce v. Underwood, 487 U.S. 552, 565 (1988), and substantial evidence is less than a preponderance of the evidence but

more than a mere scintilla, <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971), we find that substantial evidence supported the ALJ's assessment of these medical opinions, and the RFC determination which flowed from this medical opinion review.

In sum, the ALJ's decision that Harrison could perform a limited range of light work was supported by substantial evidence in the medical record, and the decision to deny benefits to Harrison was thoroughly explained by the ALJ in the decision denying this application for benefits. Therefore, we will affirm the decision of the ALJ, direct that judgment be entered in favor of the defendant, and instruct the clerk to close this case.

## V.    <u>Conclusion</u>

Accordingly, because we find that the ALJ's decision is supported by substantial evidence, IT IS ORDERED that the Mr. Harrison's request for a new administrative hearing is DENIED, the final decision of the Commissioner denying this claim IS AFFIRMED. IT IS FURTHER ORDERED that final judgment should be entered in favor of the Acting Commissioner and against Mr. Harrison.

An appropriate form of order follows.

So ordered this 5th day of September, 2017.

                                      ***s/Martin C. Carlson***
                                       Martin C. Carlson
                                       United States Magistrate Judge